IN THE SUPREME COURT OF NORTH CAROLINA

No. 54PA24

Filed 12 December 2025

STEVEN MATTHEW LASSITER, employee

v.

ROBESON COUNTY SHERIFF'S DEPARTMENT, alleged-employer, SYNERGY COVERAGE SOLUTIONS, alleged-carrier, and TRUESDELL CORPORATION, alleged-employer, THE PHOENIX INSURANCE CO., alleged-carrier

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 291 N.C. App. 579 (2023), affirming in part and reversing in part an opinion and award entered 17 November 2022 by the North Carolina Industrial Commission. Heard in the Supreme Court on 17 April 2025.

*McIntyre Law Office, PLLC, by Stephen C. McIntyre, for plaintiff-appellee.*

*Hedrick Gardner Kincheloe & Garofalo LLP, by M. Duane Jones and Neil P. Andrews, for defendant-appellants Truesdell Corporation and The Phoenix Insurance Company.*

*Goldberg Segalla LLP, by Allegra A. Sinclair and Gregory S. Horner, for defendant-appellees Robeson County Sheriff's Department and Synergy Coverage Solutions.*

*Wilson Ratledge, PLLC, by Frances M. Clement, for American Property Casualty Insurance Association, amicus curiae.*

BARRINGER, Justice.

This case asks us to clarify the North Carolina joint employment doctrine and apply it to the facts presented. Based upon this clarified doctrine, we hold that

plaintiff-employee does not satisfy the control requirement for joint employment. Accordingly, we reverse the decision of the Court of Appeals to the extent that the court held Truesdell Corporation qualified as a joint employer.

## I.    Background

### A. Relevant Facts

Plaintiff, Stephen Matthew Lassiter, began working for defendant, the Robeson County Sheriff's Office (RCSO), as a law enforcement officer (LEO) in March 2008. As an employee of RCSO, plaintiff was able to earn additional income by accepting approved off-duty employment opportunities. Pursuant to RCSO's written policy for off-duty work, RCSO employees were required to obtain prior approval of the Sheriff or his designee before accepting such off-duty assignments. LEOs, like plaintiff, often pursued these off-duty opportunities to meaningfully supplement their primary income.

Defendant Truesdell Corporation (Truesdell) performs concrete restoration and repair services. In October 2017, the North Carolina Department of Transportation (NC DOT) awarded Truesdell a bid to complete repair work to bridges and overpasses along I-95 in Cumberland and Robeson Counties. Truesdell and NC DOT subsequently entered into State Highway Contract DF00182 (the Contract) for this repair work.

As part of the Contract, subcontracting was permissible, and importantly, Truesdell was required to design and implement a traffic control and detour plan for

the completion of the road work. A special provision of the Contract required Truesdell to "[f]urnish" and "[u]se uniformed Law Enforcement Officers and marked Law Enforcement vehicles . . . to direct or control traffic as required by the [traffic control] plans and the Engineer." NC DOT contracted with Summit Design and Engineering (Summit) to oversee compliance with the Contract, including traffic control.

The traffic control plan required NC DOT's approval, and any subsequent changes required further approval from NC DOT or its representative. Truesdell, by way of subcontractors, developed a traffic control plan that received NC DOT approval. The traffic control plan designated locations where LEOs were to be assigned and the timeframe when LEOs would be required. Truesdell then contacted RCSO expressing its need for LEOs to direct traffic under the Contract.

Captain James Obershea and Deputy Jonathan Edwards were responsible for the approval and coordination of off-duty employment requests at RCSO. Truesdell informed Captain Obershea and Deputy Edwards of the rate of pay for LEOs pursuant to the NC DOT bid and RCSO agreed to assist with the traffic control responsibilities.

Since RCSO required that Truesdell pay LEOs directly, Truesdell requested a W-9 for each LEO. Deputy Edwards managed the distribution and collection of W-9 forms. When Truesdell issued payments, it did so based upon time sheets collected from RCSO. Captain Obershea had the authority to select which, and at what time,

LEOs would report to the off-duty work for Truesdell. Captain Obershea also had the authority to discharge an RCSO LEO from the off-duty job site if necessary. In sum, Deputy Edwards and Captain Obershea were responsible for selecting LEOs for the job, assigning them a traffic control plan position, and getting paperwork back to Truesdell.

Each night, prior to the closure of I-95, Timothy Cullipher, a senior engineer with Summit, conducted a tailgate safety meeting on behalf of NC DOT. At that meeting, Mr. Cullipher would review the traffic control plan with Truesdell's project engineer and Deputy Edwards. The parties would air concerns and make necessary adjustments to the plan conditioned upon the approval of Summit and NC DOT. This tailgate safety meeting lasted "anywhere from five minutes to ten minutes." Then, separately, Deputy Edwards would hold a meeting with only RCSO employees where LEOs were briefed and assigned by Deputy Edwards to a position on the traffic control route.

On the evening of 28 March 2019, Captain Obershea and Deputy Edwards determined that the traffic control plan required seven LEOs, rather than the six recommended by Truesdell. After Captain Obershea communicated the need for an additional LEO, Truesdell and NC DOT sent their approval. Captain Obershea then contacted plaintiff to ask if he wanted to perform off-duty traffic control work that night and plaintiff agreed. Captain Obershea instructed plaintiff to meet him at 8:00 p.m. at the location of the LEO meeting. At the meeting, plaintiff completed his

W-9 on the hood of Deputy Edward's patrol car and returned it. Plaintiff then began his shift directing traffic.

In the late evening of plaintiff's shift, Captain Obershea told plaintiff to switch positions with him on the route. Plaintiff then moved his unmarked patrol car with blue lights activated to assume Captain Obershea's position directing traffic. While plaintiff was directing traffic at his new position, he was struck by a vehicle and thrown into the air. Plaintiff sustained serious injuries and received extensive medical treatment as a result. Plaintiff then sought to obtain workers' compensation from both RCSO and Truesdell.

## B. Procedural History

On 15 April 2019, plaintiff filed a Form 18 Notice of Accident to Employer, listing both RCSO and Truesdell as his employers at the time of injury. RCSO and Truesdell each denied the existence of an employment relationship. Plaintiff then filed a Form 33 request for hearing before the North Carolina Industrial Commission.

Following a hearing on the matter, Deputy Commissioner William W. Peaslee entered an opinion and award, concluding that plaintiff was employed by RCSO at the time of his injury but not by Truesdell. Plaintiff appealed this decision to the Full Commission.

The Full Commission conducted its hearing on the matter and subsequently entered an opinion and award affirming the deputy commissioner's same conclusions.

On 12 December 2022, RCSO and its insurer, Synergy Coverage Solutions,

(collectively, RCSO defendants) filed a notice of appeal to the Court of Appeals. The Court of Appeals affirmed in part and reversed in part the Full Commission's decision. *Lassiter v. Robeson Cnty. Sheriff's Dep't*, 291 N.C. App. 579, 590 (2023). The Court of Appeals held that the Full Commission correctly concluded plaintiff was not an independent contractor but erred in concluding Truesdell was not liable as a joint employer. *Id.*

Truesdell and its insurer, The Phoenix Insurance Company, (collectively, Truesdell defendants) filed a petition for discretionary review to this Court. We allowed Truesdell defendants' petition.

## II.    Standard of Review

The question of whether an employer-employee relationship existed within the meaning of the Workers' Compensation Act, N.C.G.S. §§ 97-1 to -200 (2023), at the time of injury, is a jurisdictional fact, *Williams v. ARL, Inc.*, 133 N.C. App. 625, 627 (1999); *see also Youngblood v. N. State Ford Truck Sales*, 321 N.C. 380, 383 (1988). When issues of jurisdiction arise on appeal, " 'the jurisdictional facts found by the Commission, though supported by competent evidence, are not binding on [the appellate courts],' and we are required to make independent findings with respect to jurisdictional facts." *Williams*, 133 N.C. App. at 628 (quoting *Cook v. Norvell-Mackorell Real Est. Co.*, 99 N.C. App. 307, 309 (1990)). Thus, this Court reviews issues as to whether an employment relationship existed between parties de novo. *McGuine v. Nat'l Copier Logistics, LLC*, 270 N.C. App. 694, 700 (2020).

## III.    Analysis

Neither Truesdell defendants nor RCSO defendants challenged the Court of Appeals' determination that plaintiff was an employee of RCSO, rather than an independent contractor. Thus, the sole issue before this Court is whether RCSO was plaintiff's sole employer or whether plaintiff was also jointly employed by Truesdell. After careful review of the record, we hold that RCSO was plaintiff's sole employer.

**A.  Joint Employment Doctrine vs. Lent Employee Doctrine**

A "[p]laintiff may rely upon two doctrines to prove he is an employee of two different employers at the same time: the joint employment doctrine and the lent employee doctrine." *McGuine*, 270 N.C. App. at 700 (extraneity omitted); *see also Anderson v. Texas Gulf, Inc.*, 83 N.C. App. 634, 635 (1986).

The lent employee doctrine arises "[w]hen a[n] employer lends an employee to another party." 5 Lex K. Larson & Thomas A. Robinson, *Larson's Workers' Compensation Law* § 67.01[1] (rev. ed. 2022) [hereinafter *Larson's*]. "Under this doctrine, the lending employer is known as the 'general employer' and the borrowing employer, the 'special employer.'" *Id.* To satisfy the basic elements of the lent employee doctrine, it must be established that: "(a) the employee has made a contract of hire, express or implied, with the [special] employer; (b) the work being done is essentially that of the [special] employer; and (c) the [special] employer has the right to control the details of the work." *Id.*; *see also Collins v. James Paul Edwards, Inc.*, 21 N.C. App. 455, 459, *cert. denied*, 285 N.C. 589 (1974).

The joint employment doctrine arises in a different context. The doctrine applies when an employee simultaneously performs services for two employers in a single piece of work. *See Larson's* § 68.01. The joint employment doctrine requires that "a single employee, under contract with two employers, and under the simultaneous control of both, simultaneously performs services for both employers, and . . . the service for each employer is the same as, or is closely related to, that for the other." *Texas Gulf*, 83 N.C. App. at 636 (extraneity omitted) (emphasis omitted) (quoting 1C, Larson, *The Law of Workmen's Compensation* § 48.40, p. 8-511); *see also Larson's* § 68.01.

Under both doctrines, the first question is the same: Did the alleged employee make a contract of hire with the employer? *See Collins*, 21 N.C. App. at 459. Yet while the doctrines are related, they are still distinct. If the first question is answered in the affirmative, each doctrine then proceeds by its own elements.

North Carolina caselaw has repeatedly recognized the independent nature of the two doctrines. *See, e.g.*, *Henderson v. Manpower of Guilford Cnty., Inc.*, 70 N.C. App. 408, 413–14 (1984); *Texas Gulf*, 83 N.C. App. at 636; *McGuine*, 270 N.C. App. at 700–01.[1] However, in *Whicker v. Compass Group USA, Inc.*, a previous panel of the Court of Appeals seemingly blended the two. 246 N.C. App. 791, 800 (2016). Specifically, that panel announced, "[u]nder both the joint employment and lent

---

[1] Although these Court of Appeals cases are not controlling, this Court finds them to be persuasive.

employee doctrines, [a] [p]laintiff must show the work she was performing at the time of her injury was of the same nature as the work performed by [the alleged employer]." *Id.* This announcement was in error.

Aligned with prior North Carolina caselaw, the joint employment doctrine requires that the "service for each employer is the same as, *or is closely related to*, that for the other." *Texas Gulf*, 83 N.C. App. at 636 (citation omitted) (emphasis added). Meanwhile, the lent employee doctrine requires that "the work being done *is essentially that of the special employer*." *Id.* at 636 (emphasis added) (quoting *Collins*, 21 N.C. App. at 459). We refer to this element as the "nature of the work" requirement.

By its plain terms, the joint employment doctrine's nature of the work requirement is different than that under the lent employee doctrine. The reason for this difference lies in the differing employment relationships recognized under the two doctrines. For example, in the joint employment context, an employee is subject to the concurrent control of two employers. Where there is concurrent control of an employee, the distinction between a general and special employer can be difficult to discern. Consequently, the nature of the work requirement for joint employment necessitates only that the service for each employer be closely related to that for the other. Thus, given the differing employment relationships and in furtherance of consistency, we disavow *Whicker* to the extent that it improperly conflates the two doctrines.

**B. Applying the Joint Employment Doctrine**

Plaintiff argues that the facts giving rise to his claim for employment by two different employers meet the requirements of the joint employment doctrine. Therefore, we analyze, in turn, the elements that comprise the joint employment doctrine, as applied to the facts at hand.

### 1. *Contract for Hire*

The first element of the joint employment doctrine is the existence of an employment contract between plaintiff and Truesdell. An employment contract may be "express or implied." N.C.G.S. § 97-2(2) (2023). An implied contract "arises where the intent of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts." *Creech v. Melnik*, 347 N.C. 520, 526 (1998) (citing *Snyder v. Freeman*, 300 N.C. 204, 217 (1980)). "[I]mplied contracts can be 'inferred from the circumstances, conduct, acts or relations of the parties, showing a tacit understanding.' " *McGuine*, 270 N.C. App. at 701 (quoting *Whicker*, 246 N.C. App. at 798).

Here, an implied contract for hire between plaintiff and Truesdell can be inferred from the circumstances. Plaintiff knew he would be completing off-duty work for a company engaged in highway repair and that this company would pay him $55 per hour for his off-duty labor. Similarly, Truesdell was aware that LEOs like plaintiff were implementing its NC DOT-approved traffic control plan. In fact, Truesdell directly paid plaintiff a total of $275 for his work directing traffic on the night he was

injured. The circumstances and conduct of the parties give rise to the tacit understanding that an agreement for hire existed. Accordingly, plaintiff has established an implied contract for hire between Truesdell and himself.

### 2. *Under Simultaneous Control of Both Employers*

The second element concerns the right to control or direct the workman's labor. As in the employer-versus-independent contractor context, there is no fixed standard for determining whether control over the worker is sufficient to constitute joint employment. Rather, courts will look to various factors indicating control. *See McGuine*, 270 N.C. App. at 703 (joint employment inquiry); *Hayes v. Bd. of Trs.*, 224 N.C. 11, 16 (1944) (independent contractor inquiry). Some of these factors include: (i) whether the alleged employer supplied materials or tools for the plaintiff's work; (ii) the degree to which the alleged employer supervised the plaintiff; (iii) whether the alleged employer retained discretion to terminate the plaintiff; (iv) the degree to which the alleged employer assigned duties to the plaintiff; and (v) the degree to which the alleged employer controlled the manner and method in which the plaintiff carried out his or her duties. *McGuine*, 270 N.C. App. at 703 (citing *Henderson*, 70 N.C. App. at 410–11).

When assessing these factors, we bear in mind that the ultimate inquiry seeks to determine whether the alleged employer exercised a "right to control or direct the details of the work or what the workmen should do as the work progressed." *Hayes*, 224 N.C. at 18. The right to control is especially consequential to establishing an

employer-employee relationship. *See id.* at 15 ("The vital test is . . . the right of control or superintendence over the contractor or employee as to details."); *Anderson v. Demolition Dynamics, Inc.*, 136 N.C. App. 603, 609 (2000) ("[C]ontrol of the detail of the work[ ] may be the most significant."). Therefore, we must look closely at the facts presented for control.

When NC DOT awarded Truesdell the Contract to complete road repair, Truesdell agreed to design and implement a traffic control plan. To comply with the traffic control plan requirement, Truesdell subcontracted with two third parties. The first third party, TTCP Express, designed the plan. The second third party, AWP, supplied and placed traffic control devices (such as cones, barrels, and signs) in accordance with the plan. Before implementation, the plan was sent to NC DOT for approval, and any changes to the plan required NC DOT's reapproval. NC DOT subcontracted the responsibility of overseeing compliance with the approved plan to Summit, which acted as NC DOT's "eyes and ears" on the project. Plaintiff argues that the complexity of the traffic control plan as required by NC DOT demonstrates that Truesdell exercised sufficient control to satisfy the joint employment doctrine. Even assuming that the plan conferred some level of control to Truesdell, the plan still did not confer control over the details of plaintiff's work—the "vital test." *See Hayes*, 224 N.C. at 15.

It is true that the traffic control plan designated locations where LEOs were to be assigned. However, Deputy Edwards and Captain Obershea chose which LEOs

would report to the job site and assigned each LEO's designated location. Truesdell never knew which LEOs Deputy Edwards and Captain Obershea would recruit or where a particular LEO would be placed. As Deputy Edwards explained, "[Truesdell] just put in a[n] order for . . . officers, and we . . . filled it." Once recruited, Captain Obershea set the hours for each LEO's off-duty shift and retained the authority to discharge any LEO during a shift.

Truesdell, for its part, did not possess unilateral authority to discharge an LEO. Instead, Truesdell would "have to come through [RCSO]" to get an officer removed from the job site. Truesdell did not even possess the authority to reposition an officer. Deputy Edwards testified that "Truesdell couldn't move the officers without going to [him] or Captain Obershea [first]." Not only that, it made no difference if Truesdell thought an officer was performing well at the job site, because it was impermissible for Truesdell to retain a particular officer for another shift. Hiring, firing, assigning, and retaining staff was Deputy Edwards and Captain Obershea's independent responsibility.

These facts further highlight the considerable stretch it would be to characterize Deputy Edwards and Captain Obershea as representatives of Truesdell. It was *RCSO policy* that required Deputy Edwards and Captain Obershea to serve as project coordinators. Deputy Edwards and Captain Obershea did not sign any legal paperwork with Truesdell to serve in this role. Moreover, Truesdell never asked Deputy Edwards or Captain Obershea to "undergo any safety classes with

[Truesdell]" or "any training" at all to be a project coordinator. And how could they? As Deputy Edwards explained, "Truesdell doesn't have any expertise or knowledge in traffic control" to specifically direct the officers. As Captain Obershea recognized, "They just contacted [us] and said, 'Th[ese] [are] the dates we're going to need some people,' and . . . [I] set that up." Captain Obershea even explained that if Truesdell gave him a traffic control plan that listed six officers, but he determined that it required seven, then RCSO, "as a team, could refuse to do the work." The project coordinators were wholly independent of Truesdell. And notably, not even plaintiff asks this Court to stretch our control inquiry this thin. Neither plaintiff nor the RCSO argued such a characterization to this Court.

As representatives of RCSO, Captain Obershea and Deputy Edwards orchestrated and commanded LEO staffing, therefore assigning the duties to LEOs. Indeed, on the night of the incident, it was Captain Obershea and Deputy Edwards who determined that the traffic control plan required an additional officer. Captain Obershea assessed and communicated this need, which was only then approved by both Truesdell and NC DOT. After approval, Captain Obershea called plaintiff to staff the additional position.

Moreover, at the job site, LEOs exercised considerable independence. The LEOs performing traffic control duties were able to take breaks as needed or even leave without Truesdell's permission. Breaks were coordinated internally with "no one at Truesdell directing [them]." In fact, in the event of a county-related emergency,

LEOs could be called off the job site to respond. Moreover, LEOs had a duty to engage in law enforcement activities—to the exclusion of their traffic control duties—if they encountered someone committing a crime.

Truesdell neither directed nor instructed the manner and method in which plaintiff carried out his duties. Instead, plaintiff relied exclusively upon his law enforcement experience and training in managing the traffic flow. For instance, plaintiff would occasionally move into the lane of travel or move barrels off the roadway to execute the plan. These details of plaintiff's traffic control work were independent of Truesdell's instruction or supervision. No Truesdell representatives were present where traffic was being directed. Indeed, Deputy Edwards explained that on the night of the accident, RCSO and its officers "had no contact with any representative of Truesdell . . . until the accident [occurred]."

Furthermore, Truesdell did not supply plaintiff with tools or equipment. Plaintiff was equipped with his RCSO badge, his personal flashlight, a reflective jacket borrowed from another deputy, a county-owned vehicle with blue lights, a siren, and a radio.

On this record, the indicia of control fall short of establishing Truesdell as a joint employer. The extent of Truesdell's control was twofold: Truesdell designated the locations to station LEOs and the direction to send traffic. However, assigning a worker both a place and a task, by itself, does not suffice to create an employer-employee relationship. *See Lewis v. Barnhill*, 267 N.C. 457, 466 (1966) (holding that

directing a worker where to place steel joists was insufficient employer-like control, because "[h]ow he was to get the joist to that position was left to [worker]'s skill and judgment"); *Collins*, 21 N.C. App. at 461 ("The fact that [the defendant's] employee told [the plaintiff] where to deliver the first load of asphalt and drew him a route map to show him how to get there[ ] hardly amounts to such supervision and control over his activities as to . . . enter into some type of special employment relationship with [the defendant]."); *Demolition Dynamics*, 136 N.C. App. at 610 (observing a lack of control where although the "supervisor of the demolition project[ ] directed [the plaintiff] regarding what needed to be done, no evidence was presented that the latter was told *how* to do the specific tasks assigned").

Even where this Court has concluded an employer's control was sufficient, it required more indicia of control than that which is presented here. *See Leggette v. J.D. McCotter, Inc.*, 265 N.C. 617 (1965). For instance, in *Leggette*, a representative of the employer-company was present at the job site and giving active, specific instructions to the plaintiff-employee. *Id.* at 619. There, the employer's representative testified, "If I told [the plaintiff-employee] to move something else he did if he could. . . . I directed [the plaintiff-employee] what I wanted him to do." *Id.* The employer's representative further explained that at the time of the plaintiff-employee's accident, the representative "ordered" the plaintiff-employee to lower the beam that ultimately injured him. *Id.* Whereas here, it was Captain Obershea—not a representative of Truesdell—who ordered plaintiff to switch positions with him on

the route, ultimately leading to plaintiff's injury. The record before us simply falls short in supplying facts that this Court has recognized as sufficient for establishing control.

Bound by the record and informed by the caselaw, we hold that plaintiff has failed to establish simultaneous control by both employers. Rather, plaintiff was supervised by Captain Obershea and Deputy Edwards from RCSO and independently exercised the manner in which he directed traffic. Such circumstances do not satisfy the "crucial test" of control by Truesdell. *See Lewis*, 267 N.C. at 465 ("The crucial test . . . is whether he passes under the [alleged employer]'s right of control with regard not only to the work to be done but also to the manner of performing it." (emphasis omitted) (quoting *Weaver v. Bennett*, 259 N.C. 16, 28 (1963))).

### 3. *Nature of the Work Requirement*

The third element is the nature of the work requirement. As clarified above, a plaintiff proceeding under the joint employment doctrine need only demonstrate that the "service for each employer is the same as, or is closely related to, that for the other." *Texas Gulf*, 83 N.C. App. at 636 (extraneity and citation omitted). Here, plaintiff was engaged in protecting the public safety by directing the route of traffic during road repairs. Importantly, plaintiff's traffic control work was in furtherance of both his duty as a police officer and Truesdell's road repair project. Therefore, the third element—the nature of the work requirement—has been satisfied.

**\* \* \***

The record and caselaw compel the conclusion that plaintiff was not subject to sufficient control to render Truesdell a joint employer. Before closing, we emphasize the indispensable function law enforcement provides to our community. The decision before us was a difficult one, but fidelity to the record, competent findings of the Industrial Commission, and North Carolina caselaw leave us no alternative. Therefore, we hold that RCSO was plaintiff's sole employer at the time of the accident. We observe that moving forward nothing in this opinion precludes sheriff and police offices from adopting contractual measures to better ensure joint workers' compensation benefits to those most dedicated to our safety. *See Est. of Belk v. Boise Cascade Wood Prods., L.L.C.*, 263 N.C. App. 597, 602 (2019) (recognizing that an explicit agreement regarding the right of control is "strong evidence" of establishing an employer-employee relationship).

## IV. Conclusion

The joint employment doctrine is related to, yet distinct from, the lent employee doctrine. A joint employment relationship arises where a single employee, under contract with two employers, and under the simultaneous control of both, simultaneously performs services for both employers, and those services for each employer is the same as, or is closely related to, that for the other. A careful appraisal of the record reveals that plaintiff was not under sufficient control of Truesdell to create joint employment. Therefore, we must hold that RCSO was plaintiff's sole

employer. We reverse the decision of the Court of Appeals to the extent that the court

held Truesdell qualified as a joint employer.

REVERSED IN PART.

Chief Justice NEWBY concurring in part and dissenting in part.

I concur with most of the majority's analysis. I agree with the majority's distinction between the joint employment doctrine and the lent employee doctrine, the majority's determination that an implied employment contract existed between plaintiff and defendant Truesdell Corporation, and the majority's conclusion that the nature of plaintiff's work for each employer was closely related. I diverge with the majority on the element of control. For this element, I would affirm the Court of Appeals' determination that Truesdell exercised joint control over plaintiff alongside defendant Robeson County Sheriff's Office (RCSO). I believe our analysis regarding Truesdell's exercise of control is best informed by our decision in *Leggette v. J. D. McCotter, Inc.*, 265 N.C. 617, 144 S.E.2d 849 (1965). Based on *Leggette*, I would hold that plaintiff was a joint employee of Truesdell and RCSO, and that both can be liable for plaintiff's workers' compensation. I therefore respectfully concur in part and dissent in part.

Plaintiff, a law enforcement officer at RCSO, was injured off duty while directing traffic at a construction site for Truesdell. As a result, plaintiff filed workers' compensation claims against both RCSO and Truesdell. As this Court is only deciding whether Truesdell jointly employed plaintiff, the following facts focus primarily on Truesdell's relationship with off-duty law enforcement officers such as plaintiff who worked at Truesdell's construction site.

The Department of Transportation (NCDOT) awarded Truesdell a bid for repairing bridges along a highway. Knowing that this project would cause serious traffic disruptions, NCDOT required Truesdell to implement a traffic control plan and retain off-duty law enforcement officers for their specialized skill in directing traffic.

Truesdell's traffic control plan set out how traffic should be managed at different stages of the project. The plan laid out the role of law enforcement officers and dictated when, where, and how many officers were needed at the construction site to manage traffic in accordance with Truesdell's directives. This included, for example, rerouting traffic off of the highway, or slowing down traffic around the construction site.

Plaintiff's superiors at RCSO, Captain James Obershea and Deputy Jonathan Edwards, served as "project coordinators" to communicate with Truesdell, and recruit and oversee the law enforcement officers at Truesdell's construction site. Though Captain Obershea and Deputy Edwards determined which officers would work at the construction site, Truesdell indirectly maintained the ability to terminate law enforcement officers' services. If Truesdell had requested that a certain officer not come to work at the construction site, Captain Obershea and Deputy Edwards would have simply asked a different officer to work instead of potentially losing the contract with Truesdell.

Truesdell communicated with Captain Obershea and/or Deputy Edwards daily

to relay how many law enforcement officers were needed that day and what traffic patterns the officers needed to enforce. Truesdell showed Captain Obershea and Deputy Edwards where the law enforcement officers would be stationed by placing orange dots on a map and giving the map to Captain Obershea and Deputy Edwards. Once the officers arrived at the site, Captain Obershea and Deputy Edwards directed the officers on when and where to be in order to fulfill Truesdell's requests. Thus, through its traffic control plan, and indirectly through Captain Obershea and Deputy Edwards, Truesdell controlled what law enforcement officers generally needed to do, where the officers precisely needed to be, and how many officers needed to be there on a given night. Truesdell did not, however, control *how* the officers did their job. Rather, the law enforcement officers retained the ability to independently determine how best to direct traffic in accordance with Truesdell's traffic control plan.

Notably, Deputy Edwards testified that if he had concerns over the safeness of the directives contained in Truesdell's plan on a given day, he would bring these concerns up with Truesdell. These concerns included Captain Obershea and Deputy Edwards's belief that they needed an additional law enforcement officer, or their belief that they needed to alter the plan's directives to best manage traffic flow. Thereafter, Truesdell would have the final say on whether changes were needed. In fact, this is how plaintiff wound up at the construction site the night he was injured. Earlier that day, Captain Obershea and Deputy Edwards believed they needed an additional officer to fulfill their assignment that night in accordance with Truesdell's

traffic control plan—namely, rerouting traffic off the highway. Unable to make this decision unilaterally, Captain Obershea and Deputy Edwards contacted Truesdell to approve their request. After Truesdell approved Captain Obershea and Deputy Edwards's request, Captain Obershea and Deputy Edwards asked plaintiff if he wanted to work that night. Plaintiff accepted and, that night, while in position to direct traffic off the highway in accordance with the traffic control plan, plaintiff was struck by a vehicle and suffered severe injuries.

Based on these facts, the dispositive question is whether Truesdell exercised sufficient control over plaintiff to render it a joint employer of plaintiff. "Joint employment occurs when a single employee, under contracts with two employers, simultaneously performs the work of both under the control of both. In such a case, both employers are liable for work[ers'] compensation." *Leggette*, 265 N.C. at 621–22, 144 S.E.2d at 852 (quoting 1 Arthur Larson, *Workmen's Compensation Law* § 48.40 (1952)). As the majority points out, when assessing the element of control, courts should determine whether the alleged employer exercised a "right to control or direct the details of the work or what the workmen should do as the work progressed." *Hayes v. Bd. of Trs. of Elon Coll.*, 224 N.C. 11, 16, 18, 29 S.E.2d 137, 140, 141–42 (1944).

I believe that the analysis of the question of Truesdell's control should be guided by this Court's opinion in *Leggette*.[1] In *Leggette*, a building supply company

---

[1] The majority lists five factors to guide courts when determining whether an alleged employer exercised control over a worker. The majority pulls these five factors from a Court of Appeals decision in *McGuine v. National Copier Logistics, LLC*, 270 N.C. App. 694, 703,

rented out a piece of heavy machinery, along with the services of the machine's operator, to a construction company. 265 N.C. at 618, 144 S.E.2d at 850. This Court determined that the building supply company and the construction company exercised joint control over the operator. *Id.* at 623, 144 S.E.2d at 853. When comparing the employers in the present case to the employers in *Leggette*, RCSO is analogous to the building supply company, and Truesdell is analogous to the construction company. Because the present case concerns only whether Truesdell jointly employed plaintiff, when recounting this Court's decision in *Leggette*, I will focus primarily on this Court's discussion of the construction company's relationship with the operator. Then I will analogize the construction company's relationship with the operator to Truesdell's relationship with off-duty law enforcement officers such as plaintiff in the present case.

In *Leggette*, this Court relied on the following to determine that the construction company was a joint employer of the operator. First, this Court observed that the construction company's superintendent directed the operator on where to go

---

841 S.E.2d 333, 340 (2020). In *McGuine*, to derive such factors, the Court of Appeals pointed to facts relied upon in an earlier Court of Appeals decision in *Henderson v. Manpower of Guilford County, Inc.*, 70 N.C. App. 408, 410–11, 319 S.E.2d 690, 692 (1984). *McGuine*, 270 N.C. App. at 703, 841 S.E.2d at 340. In *Henderson*, however, the Court of Appeals did not list out any factors to establish control. 70 N.C. App. at 409–15, 319 S.E.2d at 691–94. Instead, the Court of Appeals compared the facts of its case to those in *Leggette*. *Henderson*, 70 N.C. App. at 413, 319 S.E.2d at 693. It is from these facts that the Court of Appeals derived its list of factors. *See McGuine*, 270 N.C. App. at 703, 841 S.E.2d at 340. While I do not necessarily disagree with the five factors, and while I generally agree with my dissenting colleague's application of these factors, I point out the history of the factors to show that the factors can be traced back to *Leggette*.

and to complete general tasks like "move[ ] earth" and "pour concrete." *Id.* at 622, 144 S.E.2d at 853. The operator, however, independently handled the machine and ensured that it was in working condition. *Id.* As the construction company's superintendent testified, "There was nobody [who] could even start [the machine] up. He . . . was in the entire charge of that machine and he was the . . . boss of that machine. I told him what I wanted done with the machine." *Id.* at 619, 144 S.E.2d at 850 (first alteration in original). In other words, the construction company's superintendent generally told the operator *what* tasks to complete but not *how* to accomplish such tasks.

The operator's actions on the day of his death illustrate the nature of his employment relationship with the construction company. That day, the operator volunteered to use his machine to assist other workers in lifting a 565-pound, 16-foot-long beam on top of 10-foot-high columns that sat 16 feet apart. *Id.* at 619, 144 S.E.2d at 851. This was an unusual job. The superintendent testified, "To my knowledge this machine hadn't been used to lift any beams prior to this." *Id.* Even though the operator volunteered to do so, the construction company maintained control over whether the operator lifted the beam; indeed, the superintendent testified, "If I had told him not to do it he wouldn't have done it." *Id.* With no instructions otherwise, the operator proceeded. *Id.* This dangerous endeavor took a group effort; several of the construction workers assisted in the process. *Id.* at 619–20, 144 S.E.2d at 851. When the operator attempted to place the beam a first time,

the superintendent told the operator to lower the beam because it was not in place. *Id.* at 619, 144 S.E.2d at 851. Then the operator lowered the beam and independently placed tracks underneath it to try again. *Id.* All the while, even though the superintendent assisted the operator in placing the beam, the operator independently handled the machine. *Id.* It was when the operator incorrectly did so—when he "apparently pushed the wrong valve or lever"—that the beam swung around and hit him. *Id.* Despite the fact that the operator was killed while independently handling the machine, this Court determined that the construction company exercised sufficient control over the operator to render the operator a joint employee of the construction company. *Id.* at 623, 144 S.E.2d at 853.

Additionally, to show that the construction company exercised joint control over the operator, this Court pointed out that the construction company had the ability to terminate the operator. Specifically, this Court noted that while only the building supply company could "terminate [the operator's] general employment," the construction company maintained the ability to terminate the operator's services at the jobsite. *Id.* at 618, 622, 144 S.E.2d at 850, 853.

Finally, this Court emphasized that the operator's work benefited both the building supply company and the construction company. *Id.* at 622, 144 S.E.2d at 852. The building supply company commonly rented its equipment to its customers, including the construction company. *Id.* at 622, 144 S.E.2d at 852–53. Then the construction company benefited from the operator's services and expertise with the

machine. *Id.* at 622, 144 S.E.2d at 853.

The level of control exercised by Truesdell in the present case is similar to that exercised by the construction company in *Leggette*. Here, like the superintendent in *Leggette* who directed the operator to complete general tasks like moving earth and pouring concrete, Truesdell used its traffic control plan and communications with Captain Obershea and Deputy Edwards to direct law enforcement officers generally on what to do, like reroute traffic off the highway. *See id.* After being given such general tasks, like the operator in *Leggette* who independently handled the machine, law enforcement officers independently used their own equipment and specialized knowledge in law enforcement to direct traffic. *See id.* Thus, like the construction company in *Leggette*, Truesdell generally told the law enforcement officers *what* was needed on a nightly basis. Then the officers determined *how* this would be accomplished.

These similarities are apparent when comparing the circumstances surrounding plaintiff's injury in the present case to the circumstances surrounding the operator's injury in *Leggette*. Similar to the operator in *Leggette*, plaintiff was injured while independently doing his job. On the night of the accident, Truesdell, through its traffic control plan and through Captain Obershea and Deputy Edwards, assigned the law enforcement officers to reroute traffic off the highway. Captain Obershea told plaintiff where to position himself in accordance with Truesdell's traffic control plan. It was while plaintiff independently performed such task—i.e., by

positioning himself in the road with his blue lights activated—that plaintiff was struck by a vehicle and seriously injured. This is similar to *Leggette*, where the construction company controlled whether the operator completed a certain task, namely, moving a heavy beam with the machine. *See id.* at 619, 144 S.E.2d at 851. Then the operator, like plaintiff here, was injured when independently completing such task—i.e., when he mishandled the machine. *See id.* The level of control exercised by the construction company is similar in that the operator would not have lifted the beam if the construction company's superintendent had told him not to, and plaintiff would not have been where he was, directing traffic in such a manner, if not required by Truesdell.

Like this Court in *Leggette*, I would conclude that this level of control is sufficient to render Truesdell a joint employer of plaintiff. The majority, on the other hand, emphasizes that Truesdell did not control certain details of how law enforcement officers did their job. For instance, the majority points out that Truesdell would not direct officers to "move into the lane of travel or move barrels off the roadway to execute the plan." But this Court did not emphasize such details in *Leggette*. There the construction company hired the operator for his skill in operating heavy machinery. This Court determined it to be sufficient that the construction company assigned general tasks to the operator; it was not necessary that the construction company direct the operator on how to actually use the machinery to do the various tasks. *See id.* at 621, 144 S.E.2d at 852. Similarly, here Truesdell was

required to hire the law enforcement officers specifically for their specialized skill in traffic management. Because of this skill, as Deputy Edwards testified, Truesdell did not need to "micromanag[e]" the officers and direct them on how to actually manage traffic to conform with Truesdell's traffic control plan. Therefore, based on *Leggette*, I would assign less weight than the majority to the fact that Truesdell did not micromanage how the law enforcement officers did their job.

There are additional circumstances in the present case that are consistent with those in *Leggette*. Like the construction company in *Leggette*, Truesdell maintained some ability, albeit indirectly, to terminate a certain law enforcement officer's services at the construction site, but could not terminate the officer's general employment. *See id.* at 618, 622, 144 S.E.2d at 850, 853. Deputy Edwards testified that if Truesdell had asked RCSO to stop sending a certain officer, then Deputy Edwards, "instead of sacrificing the whole contract," would not have asked that officer to return. Like in *Leggette*, any such termination of an officer's services at the jobsite, however, would not affect the officer's employment at RCSO. Thus, Truesdell's ability to terminate an officer's services at the jobsite weighs in favor of control.

Moreover, like the operator's work benefited the construction company in *Leggette*, the law enforcement officers' work benefited Truesdell. Truesdell was required to hire the officers for their specialized knowledge in traffic management. Truesdell, through its traffic control plan, dictated how to best utilize the officers' skillset to efficiently complete its construction job. The officers were necessary for

Truesdell to complete its project.

Finally, in addition to the similarities between the present case and *Leggette*, I am persuaded by the fact that Truesdell was responsible for how many law enforcement officers were present at the jobsite. The traffic control plan set out how many officers were required each night. Truesdell had final approval over whether Captain Obershea and Deputy Edwards could bring additional officers. This is why plaintiff was asked to work on the night of the accident. If Truesdell had not controlled how many law enforcement officers were present each night, plaintiff would not have been at the site on the night of the accident. This fact weighs in favor of control.

The foregoing demonstrates that Truesdell, either directly through the traffic control plan or indirectly through plaintiff's superiors at RCSO, exercised a "right to control or direct the details of the work or what the workmen should do as the work progressed." *See Hayes*, 224 N.C. at 18, 29 S.E.2d at 141–42. Accordingly, I would hold that Truesdell and RCSO jointly employed plaintiff and can both be liable for plaintiff's workers' compensation. I therefore respectfully concur in part and dissent in part. Because the majority reaches the opposite conclusion on the issue of control, I will reiterate the majority's statement: "nothing in th[e] [majority] opinion precludes sheriff and police offices from adopting contractual measures to better ensure joint workers' compensation benefits to those most dedicated to our safety."

Justice RIGGS dissenting.

Truesdell Corporation (Truesdell) and the Robeson County Sherrif's Department (RCSO) jointly employed Deputy Steven Lassiter when he was injured while directing traffic for Truesdell's highway construction project. I generally agree with the test articulated by the majority to clarify the joint employment doctrine, and I agree that the test applied by the Court of Appeals muddled the law. However, I do not think that error changes the ultimate outcome. I would hold that there is sufficient factual evidence Truesdell should be jointly liable for Deputy Lassiter's injuries because Truesdell had a "right to control or direct the details" of his work. *Hayes v. Bd. of Trs. of Elon College*, 224 N.C. 11, 18 (1944). As such, I would modify and affirm the Court of Appeals' holding that Deputy Lassiter was jointly employed by RCSO and Truesdell at the time of his injury.

In late 2017, the North Carolina Department of Transportation (NCDOT) awarded Truesdell a bid to repair bridges and overpasses along I-95 in Cumberland and Robeson Counties. Truesdell agreed to "provide and furnish all materials, machinery, implements, appliances, and tools, and perform the work and required labor to construct and complete" the contract with NCDOT. Truesdell was responsible for coordinating a complicated highway construction project on I-95, which had the potential to cause traffic for several miles. The construction did not involve only minor traffic disruptions—Truesdell oversaw nightly lane closures,

detours, and other serious traffic diversions. Given the complexity of the project, Truesdell's contract with NCDOT contained special provisions requiring it to design and implement a traffic control plan to ensure public safety during I-95 road closures. To meet these requirements, Truesdell supervised two subcontractors: TTCP Express to oversee the design of the traffic control and detour plan and AWP to supply and place traffic control devices. Even with the subcontractors, NCDOT still held Truesdell ultimately responsible for compliance with the traffic control plan—if NCDOT or its representatives observed non-compliance with the approved plan, it would report the issue to Truesdell, not to TTCP Express or AWP. Truesdell was solely responsible for ensuring traffic safety during a complex, technical construction project.

Deputy Lassiter was struck by a vehicle while performing off-duty traffic control work for Truesdell. At the time of the accident, Deputy Lassiter was employed by RCSO as a criminal investigator. He received training on traffic control during his Basic Law Enforcement Training, then assisted with traffic control as it arose in the course of his job, including while responding to car accidents and natural disasters. At the time of the accident, Deputy Lassiter was working in an off-duty capacity to direct traffic for Truesdell's highway construction project.

RCSO permitted its officers to engage in approved off-duty employment to supplement their RCSO income. Deputy Lassiter was told about the opportunity to direct traffic for Truesdell by his supervising officer, Captain James Obershea. When

Deputy Lassiter arrived at the highway construction site, he met with other law enforcement officers and completed a W-9 form for Truesdell. Truesdell paid Deputy Lassiter directly for his off-duty work.

The joint employment doctrine applies when "a single employee, under contracts with two employers, simultaneously performs the work of both under the control of both. In such a case, both employers are liable for workmen's compensation." *Leggette v. J.D. McCotter, Inc.*, 265 N.C. 617, 621–22 (1965) (quoting 1 Arthur Larson, *Workmen's Compensation Law* § 48.40 (1952)). Under the joint employment doctrine, as clarified in the majority, plaintiffs must prove that they were (1) under contract with both employers, (2) were subject to the control of the secondary employer, and (3) were engaged in the "nature of the work" of the secondary employer. I agree with the majority that Deputy Lassiter has met his burden on the first and third prongs but would hold that he has also satisfied the second prong.

The core of the second prong is whether the alleged employer had a "right to control or direct the details of the work." *Hayes*, 224 N.C. at 18. This is a fact-specific inquiry, measured by whether and to what degree the alleged employer: (i) supplied equipment, (ii) supervised putative employees, (iii) "retained discretion to terminate" putative employees, (iv) assigned duties to putative employees, and (v) controlled "the manner and method in which temporary employees carried out their duties." *McGuine v. Nat'l Copier Logistics, LLC*, 270 N.C. App. 694, 703 (2020) (cleaned up)

(citing *Henderson v. Manpower of Guilford Cnty., Inc.*, 70 N.C. App. 408, 410–11 (1984)); *see Leggette*, 265 N.C. at 621–23. While on the facts of this case, these factors are not all equally important, each factor here points to Truesdell's sufficient right to control Deputy Lassiter's work.

Here, the supplied equipment factor does not overwhelmingly establish Truesdell's control, but it is consistent with a joint employment situation. Deputy Lassiter did not exclusively use RCSO equipment. His gun and flashlight were his personal equipment. He borrowed a reflective jacket from a coworker that was not issued by RCSO and did not have any RCSO markings on it. The primary RCSO-specific equipment Deputy Lassiter used was his unmarked RCSO car and his badge. Although Truesdell did not supply Deputy Lassiter with any equipment directly, it contracted to provide traffic control equipment, like barrels and road signs. While Truesdell did not provide Deputy Lassiter with any personal equipment, it contracted to provide equipment necessary to engage in traffic control work.

Truesdell also had the right to supervise the law enforcement officers employed in effectuating the traffic control plan. Chief Edwards testified that he "[took] direction from Truesdell of what they want" regarding the traffic route and set-up. Truesdell communicated "what they want[ed]" through technical traffic control plans and route maps shared with Chief Edwards and Captain Obershea at daily pre-shift meetings. On the night of Deputy Lassiter's injury, Truesdell's traffic plan included a full detour, closing the highway and taking drivers off of I-95. The traffic plans,

routes, and assignments Truesdell provided to Captain Obershea and Chief Edwards were not minor suggestions—they were examples of Truesdell exercising supervision over RCSO employees to execute their work on a dynamic, technical, and complex construction project.

Next, Truesdell retained the power to terminate the officers. If an officer left or performed poorly at the Truesdell job, it would have had no effect on their employment with RCSO and would not put the officer on their supervisor's "bad list." However, if Truesdell did not want to retain an officer who was not meeting performance expectations in this complex project, Chief Edwards testified that he would have "replaced that person with somebody else the next time." Captain Obershea, coordinating on behalf of Truesdell, testified that he would have told the officer that his services would "no longer be needed." In both *Leggette* and *Henderson*, a putative joint employer had sufficient termination power if it could request the termination or replacement of an unsatisfactory employee, even if the request was made to the other putative employer. *See Leggette*, 265 N.C. at 622–23 (reasoning that a construction company was a joint employer when it could stop another company's operator from using rented machinery if his work was unsatisfactory but could not unilaterally discharge or replace him); *see also Henderson*, 70 N.C. App. at 411–12 (holding that a company was a joint employer when they were "not obligated to keep any person on the job site sent over by [the other putative employer] if he was not satisfactory" and could call the other company to request they replace the

unsatisfactory employee). Chief Edwards and Captain Obershea, in their role as "funnels" for Truesdell's instructions, had the authority to prevent officers from coming back if Truesdell requested their termination.

Each day, before each shift, Ethan Garner, the project engineer from Truesdell or another Truesdell employee communicated the assigned traffic pattern and planned route to Captain Obershea and Chief Edwards. A Truesdell engineer and the coordinating officers had daily "tailgate meetings" before each shift to discuss the traffic control plan and so the Truesdell engineer could update the officers on any changes. RCSO officers did not decide where the traffic control measures would be— Truesdell's engineers did. Each day, when Truesdell's engineer told Chief Edwards and Captain Obershea the traffic route, he would give them a map with orange dots where Truesdell wanted deputies. Once Truesdell's engineers communicated the work assignments to Chief Edwards and Captain Obershea, they acted as a "funnel" and communicated the location assignments to the law enforcement officers. Chief Edwards testified that he advised the officers where to go based on the Truesdell assignments, saying he told officers "Hey, this is what they want. Matt, if you'll go here. Obershea, if you'll go here." The fact that Truesdell did not communicate these assignments directly to the officers or assign individual officers to each location it identified does not indicate a lack of assignment power, *see Leggette*, 265 N.C. at 618, 622–23 (reasoning that a construction company was a joint employer when its site coordinator gave plaintiff work assignments); rather Captain Obershea and Chief

Edwards' communications with the officers were on behalf of Truesdell. This is emphasized by Captain Obershea's belief that he was working for Truesdell, not RCSO, because "[t]hey're the one that requested the . . . work be done, and they were the ones paying us." When Chief Edwards and Captain Obershea gave the officers assignments, they were acting not as supervising officers through RCSO, but as site coordinators and "funnels" for Truesdell's assignments. Truesdell exercised control over the assignment of the traffic route, plan, and traffic control locations.

Finally, Truesdell controlled the manner and method in which the law enforcement officers carried out their duties by creating the traffic plan, confirming any changes, and coordinating closely with the law enforcement officers. Truesdell's subcontractor, TTCP Express, drafted the certified traffic control plans under Truesdell's direction. Another Truesdell subcontractor, AWP, reviewed the traffic plans before they were sent to NCDOT for final review and approval. Once NCDOT approved the plan, Truesdell was responsible for ensuring its subcontractors accurately performed the traffic plan. The officers did not have the power to change the route or traffic plan—once assigned by Truesdell, the officers were required to direct traffic in accordance with Truesdell's traffic plan. Truesdell communicated to the officers whether the traffic control plan would involve a detour or a slowdown and where the traffic control was needed. The officers could not unilaterally decide to create a detour or slowdown, nor could they decide themselves where to put the traffic control measures. Instead, Truesdell controlled the traffic plan and route. If the

officers wanted to make changes to the manner or method of the traffic control, they had to request the changes through Truesdell, who would consult with the project's safety inspector. Truesdell engineers spoke with the coordinating officers regularly by phone and met at least daily to discuss when the officers were needed and where the construction would occur. Truesdell could control the "method and manner" of Deputy Lassiter's work.

Across each of these factors, the primary question is whether Truesdell had the right to control the details of Deputy Lassiter's work. I agree with the majority that Deputy Lassiter has established that he had an employment contract with Truesdell and that the nature of the work he performed for Truesdell was "the same as, or is closely related to" the work he completed for RCSO. *Anderson v. Texas Gulf, Inc.*, 83 N.C. App. 634, 636 (1986) (quoting 1C Arthur Larson, *Workmen's Compensation Law* § 48.40). However, Deputy Lassiter has also established that Truesdell exercised sufficient control to meet the second prong of the joint employment doctrine.

For the reasons above, I respectfully dissent. I would modify and affirm the Court of Appeals' holding that Truesdell and RCSO are jointly liable for Deputy Lassiter's injury.

Justice EARLS joins in this dissenting opinion.